**Opinion issued December 19, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00106-CV**

———————————

## IN THE INTEREST OF L.S. AND O.S., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00153J**

---

## MEMORANDUM OPINION

This case presents questions involving the parent-child relationship and our appellate jurisdiction. Here, the Department of Family and Protective Services ("DFPS") sought to terminate the parental rights of T.S. ("Mother") and J.S.

("Father") to their three minor children: L.S ("Laura"), O.S. ("Ophelia"), and A.S. ("Andrew").[1]

Following a bench trial, the trial court signed a final conservatorship decree appointing DFPS as Laura and Ophelia's managing conservator. The court found that appointment of Mother and Father as the managing or possessory conservators of Laura and Ophelia would not be in the girls' best interest. It granted Mother and Father limited visitation. The court declined to terminate their parental rights to the girls.

The trial court severed the claims involving Andrew into a separate proceeding. It then signed a final termination decree in that case terminating Mother's and Father's parental rights to Andrew. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O).

Mother and Father each timely filed a notice of appeal from the conservatorship decree regarding Laura and Ophelia. But neither Mother nor Father filed any notice of appeal from the final decree in the severed termination case regarding Andrew.

On appeal, Father raises a single issue that challenges only the termination of his parental rights to Andrew. He contends that terminating his parental rights to

---

[1]    In this opinion, we use pseudonyms to refer to the parents and their minor children. *See* TEX. R. APP. P. 9.8(b)(2).

2

Andrew is not in Andrew's best interest because it would sever Andrew's relationship with his sisters. Father raises no issue and makes no argument in our Court challenging the final conservatorship decree regarding Laura and Ophelia.

Mother raises five issues on appeal. In two of those issues, she challenges the final conservatorship decree regarding Laura and Ophelia—as described in her notice of appeal.

In Mother's other three issues, she challenges the final decree in the termination proceeding regarding Andrew—which is not referenced in her notice of appeal. With respect to those issues, Mother seeks permission to amend her notice of appeal to add the final decree in the severed termination case.

We dismiss Father's appeal for lack of jurisdiction to the extent he purports to appeal from the final termination decree regarding Andrew.

We deny Mother's request to amend her notice of appeal to add the final termination decree concerning Andrew.

And we affirm the final conservatorship decree regarding Laura and Ophelia as to both Mother and Father.

## Background

### A. Underlying Facts

Mother and Father are married and have three children together: Laura, a daughter born in 2008; Ophelia, a daughter born in 2009; and Andrew, a son born in

2021. At the time of trial in December 2023, Laura was fifteen, Ophelia was fourteen, and Andrew had just turned two.

DFPS first became involved with the family in May 2016, when it received a referral of neglectful supervision of Laura and Ophelia. Over the next ten months, two additional referrals were made—in December 2016 and March 2017. Together, the three referrals included allegations of domestic violence by Father,[2] drug use by both parents, concerns over Ophelia's hygiene, "provocative" behavior by Ophelia, and concerns that the children were not being fed enough. Each of the referrals received a disposition of either "Ruled Out" or "Unable to Determine." The girls remained living with Mother and Father.

DFPS received another set of referrals beginning in April 2022. At that time, Laura and Ophelia were both in middle school and Andrew was an infant. Ophelia has autism, and she attended a different school from Laura because of her special education needs. The April 2022 referral alleged that both parents were "using drugs resulting in the children missing school to care for their baby brother." DFPS received a similar referral in August 2022, and this referral also included an allegation that "[t]he home was observed with food and garbage all over the place, and [it] smelled of sewage."

---

[2] Although Mother filed for divorce from Father in 2016, 2017, and 2020, there was no divorce decree. Mother and Father were still married at the time of the events leading to the underlying proceeding.

Department caseworkers began investigating the allegations, but Mother and Father were uncooperative. They would not let caseworkers into their home, and they both refused to take drug tests. Caseworkers were, however, able to interview Laura, Ophelia, school personnel, Mother's father, and neighbors.

Laura repeatedly reported that her parents fed the children, washed their clothes, kept the home clean, administered medication when the children were sick, and were "very loving towards her and her siblings." Laura was always dressed appropriately, and caseworkers never observed visible bruises or marks on her. With respect to Ophelia, on the other hand, school personnel reported that she was "constantly missing school" and that, when she did go to school, she frequently appeared disheveled and unkempt, with dirty clothing and matted hair.

Mother's father reported that Ophelia's school had contacted him about her chronic absences. He went to the family's house and "discovered [Father] unconscious and [Andrew] was crying hysterically with feces spilling out of his diaper." When Father woke up, his "words were slurring, and he was unable to stand up." The home was filthy, with dishes piled in the sink, "clothing and garbage throughout the home," and no food. Mother did not allow her father to have access to the children for several months after this incident.

Neighbors reported "smelling sewage coming from the home" and "observing piles of garbage in the backyard." The home frequently did not have electricity, and

neighbors often saw the children wearing dirty clothes. One of the caseworkers could smell sewage from outside of the home, and she "observed clothing scattered on the stairs and floor along with boxes through the glass door."

In January 2023, school personnel again reported that Ophelia had missed several days of school, that she repeatedly wore the same clothes day after day, that she would arrive at school "with food stains on [her] clothes/face for days on end," that she would make inappropriate sexual comments, and that she "still tries to take food anytime she sees something within reach." Later that month, school personnel discovered that Ophelia had been self-harming, and she reported experiencing suicidal ideation. Ophelia was admitted to the hospital, and Mother consented to medical treatment by phone, but she did not visit Ophelia in the hospital. Mother's father encountered Father in the parking lot of the hospital and reported that Father "threatened to kill him and [the] caseworker if the children are removed from him."

## B.   DFPS Files Suit

Following Ophelia's hospitalization, DFPS filed its original petition and sought emergency removal of the children from Mother's and Father's care. If the children could not be safely returned to Mother and Father, DFPS sought the appointment of a relative, another suitable person, or DFPS itself as the children's sole managing conservator. Alternatively, DFPS sought termination of Mother's

and Father's parental rights to all three children based on several statutory predicate grounds. *See id.* § 161.001(b)(1)(D), (E), (K), (N), (O), (P).

DFPS created family service plans for both Mother and Father. Among other things, the service plans required the parents to maintain employment and stable housing. The service plans required both parents to submit to random drug testing, complete a substance abuse assessment, and follow all recommendations. The service plans also required the parents to complete a psychological evaluation.

Because of their ages and different needs, Laura, Ophelia, and Andrew all resided in different foster placements while the case was pending. Ophelia resided with her great-grandmother—Mother's grandmother—for two months, but by the time of trial, she was in a therapeutic foster placement.[3] Both Laura and Andrew resided in non-relative foster placements.

## C. Proceedings in the Trial Court

The trial court scheduled a bench trial to begin on December 14, 2023. On December 11, 2023, Mother's counsel filed an opposed motion for continuance and

---

[3] Ophelia displayed several concerning behaviors while she lived with her great-grandmother, including suicidal ideation, "a lot of violent talking," threats to her classmates, stealing knives, setting fires, and drawing pornography. Ophelia's great-grandmother took her to a hospital for psychiatric care, but Mother checked Ophelia out of the hospital. Once DFPS recovered Ophelia from Mother, the decision was made to move Ophelia to a foster placement, rather than have her reside with a family member. Ophelia continued to display many of these same behaviors in her foster placement.

extension of the statutory dismissal date.[4]  After hearing arguments from Mother's counsel, DFPS's counsel, the children's attorney ad litem, and counsel for Laura and Ophelia's guardian ad litem, the trial court denied Mother's motion for continuance and to extend statutory the dismissal date.

Mother attended portions of the trial and testified.  Father did not attend trial.  Father did not complete any of the services required by his service plan.  DFPS requested that he submit to drug testing on approximately fifteen occasions throughout the pendency of the case, but he never attended.  Father did submit to one court-ordered drug test in March 2023.  His hair sample tested positive for methamphetamine, "heroin that metabolized into morphine," and codeine.  The amount of methamphetamine in Father's hair sample was indicative of "a chronic drug user."  Mother's hair samples also tested positive for methamphetamine in April and August 2023, although the levels were more indicative of a "weekend binge" rather than daily use.  Mother's hair sample in April 2023 also tested positive for opiates.

---

[4]   Family Code section 263.401(a) provides that unless the trial court has commenced the trial on the merits or granted an extension as authorized by that section, the trial court automatically loses jurisdiction over the suit on the first Monday after the first anniversary of the date the court rendered a temporary order appointing DFPS as temporary managing conservator. TEX. FAM. CODE § 263.401(a); *In re G.X.H.*, 627 S.W.3d 288, 295–96 (Tex. 2021).  It is undisputed that the trial court first rendered an order appointing DFPS as the children's temporary managing conservator on January 26, 2023.  The dismissal date was therefore set at January 29, 2024.

The trial court also heard testimony about how each of the children had been doing following their removal from Mother's and Father's care. Laura was "doing very well" in her foster placement. She had made friends, was involved in extracurricular activities, and had excellent grades. She had also realized that the home environment with Mother and Father had not been stable or healthy, that her parents "weren't doing well," and that she should not have had to worry so much about her siblings.

Laura expressed to her guardian ad litem that she wanted to return to Mother's care "[o]nly if her mother completes her services and gets better." Laura's foster placement was not a long-term placement, but one of Laura's aunts had indicated her willingness for Laura to live with her.[5]

When Ophelia first moved to her foster placement, she was not able to consistently complete "activities of daily living," such as showering, brushing her teeth, or grooming herself. Ophelia was thirteen years old at the time, and although she had been diagnosed with autism, her foster mother believed that diagnosis should not have prevented her from being able to complete these activities. By the time of trial, Ophelia had improved and could perform these actions, although "she does

---

[5]   Laura's aunt—Mother's sister—has a stepdaughter around Laura's age, and she believed that Laura was a "great fit" for their family. Laura's aunt had no problem with Laura maintaining a relationship with Mother, although she was concerned that Mother and Father would try to take Laura from her household.

require prompting and queuing every day." This placement was not an adoptive placement, but Ophelia's foster mother was willing to keep her in the home.

Ophelia did not talk about Mother and Father, but her foster mother overheard Ophelia ask her caseworker whether she could see her parents. Ophelia's guardian ad litem testified that Ophelia loved Mother and wanted to be with Mother. The guardian ad litem believed that termination of Mother's rights to Laura and Ophelia would not be in their best interests.

When DFPS placed thirteen-month-old Andrew in his foster placement in January 2023, fluid had built up in his ears leading to a "borderline infection." He was not "developmentally on track." He was diagnosed with chronic ear infections and eventually had tubes surgically placed in his ears. His hearing had improved by the time of trial, but he was still not passing hearing screenings. Andrew had also been diagnosed with macrocephaly and hydrocephaly—enlargement of the head and "fluid on the brain," respectively—as well as "global delays," a seizure disorder, and asthma.

Prior to Andrew's placement in foster care, he had not received appropriate medical services for these diagnoses, and he was not regularly seeing a pediatrician despite appointments being scheduled for him. Andrew's foster mother ensured that he visited a neurologist, and she also took him to speech and occupational therapy several times per month. His foster mother was willing to adopt him. Andrew saw

Laura and Ophelia on a weekly basis, and his foster mother was in contact with the aunt who was interested in allowing Laura to live with her.

None of the children testified at trial. At the close of testimony, the trial court announced its intention to render judgment after it had spoken with Laura in chambers.

**D.     The Trial Court's Final Decrees and This Appeal**

At the rendition hearing, the trial court found that DFPS had met its burden to terminate Mother's and Father's parental rights to Andrew based on four statutory predicate grounds and Andrew's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O), (b)(2).

With respect to Laura and Ophelia, the trial court found that while DFPS met its burden on the same four predicate grounds, termination of Mother's and Father's parental rights was not in the girls' best interest. The court appointed DFPS as Laura and Ophelia's sole managing conservator. The court did not grant any conservatorship or possessory rights over the girls to Mother and Father, but it did permit visitation "in a therapeutic setting following the commencement of therapy services and a recommendation for the parents to undergo therapeutic visitations with the girls."

On January 29, 2024, the trial court signed a "Final Decree In Suit Affecting the Parent-Child Relationship," in cause number 2023-00153J, that only affected

11

Mother's and Father's rights to Laura and Ophelia. The final decree memorialized the court's statements on the record during the rendition hearing and included findings that (1) the appointment of Mother and Father as managing conservators of Laura and Ophelia would not be in their best interests "because the appointment would significantly impair the children's physical health or emotional development"; and (2) appointing the parents as possessory conservators "would endanger the physical or emotional welfare of the children."

That final decree appointed DFPS as Laura and Ophelia's sole managing conservator. And it allowed Mother and Father to have visitation with Laura and Ophelia, but only after the parents completed a psychological assessment and if the visit occurred in a therapeutic setting. The court further required Mother and Father to comply with their service plans.

The trial court then severed the claim involving termination of Mother's and Father's rights to Andrew into a separate case with another cause number—2023-00153J-A—"to proceed as such to final judgment in this Court."

On February 8, 2024, Father filed a notice of appeal from the final decree in the conservatorship case involving Laura and Ophelia. Father's notice of appeal clearly states that he "desires to appeal the Final Decree in Suit Affecting the Parent-Child Relationship signed by the Court on January 29, 2024." The notice of appeal states the cause number as "2023-00153J."

12

Mother also filed a notice of appeal from the final decree in the conservatorship case involving Laura and Ophelia. Her notice of appeal similarly states the cause number as "2023-00153j" and states that she "desires to appeal the Final Decree in Suit Affecting the Parent-Child Relationship signed by the Court on January 29, 2024."

On February 12, 2024, the trial court signed a "Final Decree for Termination" in cause number 2023-00153J-A—the severed termination case regarding Andrew. That final decree terminated Mother's and Father's parental rights to Andrew and appointed DFPS as Andrew's sole managing conservator.[6] As referenced above, neither Mother nor Father filed a notice of appeal from the final decree in the severed termination case.

## Appellate Jurisdiction

As a preliminary matter, we must first address our appellate jurisdiction. *See Jack M. Sanders Fam. Ltd. P'ship v. Roger T. Fridholm Revocable, Living Tr.*, 434 S.W.3d 236, 240 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

A party who seeks to alter a trial court's final judgment or other appealable order must timely file a notice of appeal regarding that judgment or order. Tex. R.

---

[6] The trial court found by clear and convincing evidence that termination of both parents' rights was appropriate under four statutory predicate grounds and that termination was in Andrew's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (b)(2).

APP. P. 25.1(c), 26.1. If a party fails to do so, a court of appeals lacks jurisdiction over that case. *See Brumfield v. Williamson*, 634 S.W.3d 170, 189 (Tex. App.—Houston [1st Dist.] 2021, pet. denied). Among other requirements, the notice of appeal must "state the case's trial court number and style" and "state the date of the judgment or order appealed from." TEX. R. APP. P. 25.1(d)(1)–(2).

As detailed above, there are two different final decrees in two separate causes: (1) the final decree concerning the conservatorship of Laura and Ophelia, signed on January 29, 2024, in cause number 2023-00153J; and (2) the final decree concerning the termination of Mother's and Father's parental rights to Andrew, signed on February 12, 2024, in cause number 2023-00153J-A.

Father filed a single notice of appeal that explicitly pertains to the final decree in the conservatorship case involving Laura and Ophelia.[7] The notice of appeal states that Father "desires to appeal the Final Decree in Suit Affecting the Parent-Child Relationship signed by the Court on January 29, 2024." It specifically identifies the cause number and style for the conservatorship case involving Laura and Ophelia, and it also attaches a file-stamped copy of that final decree. *See* TEX. R. APP. P. 25.1(d).

---

[7] There is no dispute that Father's notice of appeal was timely filed. *See* TEX. R. APP. P. 26.1(b) (requiring, in accelerated appeals, party to file notice of appeal within twenty days after judgment or order is signed).

However, Father does not challenge that final decree in our Court. Instead, Father challenges a different final decree in the severed termination case, under cause number 2023-00153J-A, regarding Andrew. Father clearly states in his appellant's brief that "[Father] makes no appeal of the provisions of the Final Order granting managing conservatorship of [Laura] and [Ophelia]" and that "[Father] appeals only the order terminating [his] parental rights to [Andrew]." In his prayer for relief, Father again states that he seeks reversal only of "the trial court's decision to terminate [his] parental rights as to [Andrew]" and appointment as Andrew's possessory conservator.

Thus, Father filed a notice of appeal plainly identifying one final judgment—but he seeks reversal of a different final judgment in another case.

Our supreme court has explained that "[a] court of appeals has jurisdiction over any appeal where the appellant files an instrument that 'was filed in a bona fide attempt to invoke appellate court jurisdiction'" over a case. *Kinder Morgan SACROC, LP v. Scurry Cnty.*, 622 S.W.3d 835, 846 (Tex. 2021) (quoting *Grand Prairie Indep. Sch. Dist. v. S. Parts Imports, Inc.*, 813 S.W.2d 499, 500 (Tex. 1991) (per curiam)). Whether an instrument may constitute a bona fide attempt to invoke an appellate court's jurisdiction over a particular judgment or decree is a matter of common sense and reasonableness. *See In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005).

15

In *City of San Antonio v. Rodriguez*, 828 S.W.2d 417, 418 (Tex. 1992) (per curiam), the supreme court held that a notice of appeal with the correct case style but displaying the wrong cause number can constitute a bona fide attempt to perfect an appeal of the judgment in that case style. There, the supreme court concluded there was "no suggestion of confusion regarding the judgment from which the [appellant] sought appeal" because "the cause number *incorrectly* transcribed on the [appellant's] notice of appeal has no association with or similarity to the style of the case now before us." *Id.*

On the other hand, an instrument that does not reasonably indicate the judgment sought to be appealed is unable to satisfy that standard and cannot be reasonably construed as invoking a court of appeals' jurisdiction. *See In re K.A.F.*, 160 S.W.3d at 928 ("Though there are myriad reasons why a party might file a motion for new trial, we fail to see how invoking the court of appeals' jurisdiction could reasonably be considered one of them. . . . We conclude that a motion for new trial is not an instrument that may be considered a bona fide attempt to invoke the appellate court's jurisdiction . . . ."); *see also Cartwright v. Dep't of Fam. & Protective Servs.*, No. 01-05-00994-CV, 2006 WL 2772827, at *1 (Tex. App.—Houston [1st Dist.] Sept. 28, 2006, no pet.) (mem. op.) (holding that request for findings of fact and conclusions of law made three months after trial court's order

16

terminating parental rights was not "good faith effort" to invoke appellate jurisdiction).

Along these lines, our Court has held that a notice of appeal which displays the wrong cause number and does not state the date of the final judgment sought to be appealed is not a bona fide attempt to perfect an appeal. *See Stubblefield v. Courtland Vill. Townhomes Homeowner's Ass'n*, No. 01-00-01328-CV, 2002 WL 1340296, at \*1–2 (Tex. App.—Houston [1st Dist.] June 20, 2002, no pet.) (not designated for publication) (noting that over course of several years, appealing party had filed four appeals regarding same issues).

Here, Father's notice of appeal displays the cause number and case style of only the conservatorship case involving Laura and Ophelia. And the body of Father's notice of appeal explicitly describes the final decree in the conservatorship case and the date that it was signed. Moreover, the final decree in the conservatorship case is attached to Father's notice of appeal as a reference point.

There is no reasonable suggestion of confusion about the final decree from which Father sought to appeal. His notice of appeal does exactly what it purports to do. It invokes our appellate jurisdiction over the trial court's final decree, signed on January 29, 2024, in the conservatorship case involving Laura and Ophelia—and nothing more. It contains no reasonable indication that Father sought to appeal a different final decree in the severed termination case involving Andrew.

17

We therefore conclude that Father's notice of appeal does not constitute a bona fide attempt to invoke our appellate jurisdiction over the final decree in the separate termination case involving Andrew. *See Nnaka v. Mejia*, No. 01-18-00779-CV, 2020 WL 425126, at *4 (Tex. App.—Houston [1st Dist.] Jan. 28, 2020, no pet.) (mem. op.) ("We conclude that filing a notice [of] appeal from the July 24, 2018 sanctions order is not a bona fide attempt to invoke appellate court jurisdiction over the July 20 final judgment." (quotations omitted)).

Because Father did not file a notice of appeal regarding the final decree in the termination case involving Andrew, or make a bona fide attempt to do so, we lack jurisdiction to consider Father's sole issue on appeal that only challenges that termination decree. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 260–61 (Tex. 2022) ("[T]he absence of a timely notice of appeal prevents the appellate court from ever exercising jurisdiction in the first place. Without jurisdiction, the court of appeals is powerless to entertain an appeal, no matter how grave the error." (citation omitted)); *Nnaka*, 2020 WL 425126, at *6 ("We conclude that Nnaka failed to invoke this Court's jurisdiction over the July 20, 2018 final judgment, and, thus, any complaints on appeal relating to that judgment fall outside the scope of this appeal.").

Additionally, because Father has not presented any issue or any argument on appeal about the final decree in the conservatorship case regarding Laura and Ophelia, as described in his notice of appeal, any such complaint now is also not

properly before us. *See Mulch Matters, Inc. v. Toro Rojo, Inc.*, No. 01-22-00322-CV, 2024 WL 1862723, at *4 (Tex. App.—Houston [1st Dist.] Apr. 30, 2024, no pet. h.) (mem. op.) (concluding that, "[e]ven under the most liberal view of our briefing rules," appellate challenge that had "no citations to the record or the evidence, no citations to any legal authorities, and no legal analysis" was not adequately briefed).

Moving next to Mother's notice of appeal, it also explicitly pertains to the final decree in the conservatorship case regarding Laura and Ophelia. It states that Mother "desires to appeal the Final Decree in Suit Affecting the Parent-Child Relationship signed by the Court on January 29, 2024," and it specifies the cause number for that conservatorship case—2023-00153J. *See* TEX. R. APP. P. 25.1(d)(1)–(2). Additionally, a file-stamped copy of the final decree in the conservatorship case is attached to Mother's notice of appeal as a reference point.[8]

---

[8] The case style on Mother's notice of appeal is similar to the termination case in that Andrew is listed along with Laura and Ophelia, but unlike in *City of San Antonio v. Rodriguez*, the body of Mother's notice of appeal expressly identifies the final decree in the conservatorship case as the only judgment that she seeks to appeal. *See* 828 S.W.2d 417, 418 (Tex. 1992) (per curiam) (stating "there is no suggestion or confusion regarding the judgment from which [appellant] sought appeal" when incorrect trial court cause number listed in notice of appeal "had no association with or similarity to the style of the case now before us"). And a copy of the final decree from the conservatorship case is attached to Mother's notice of appeal to make it clear what judgment she is appealing. Taken together, there is no inadvertent mistake or confusion in Mother's notice of appeal about the final decree that she sought to appeal. *See Stubblefield v. Courtland Vill. Townhomes Homeowner's Ass'n*, No. 01-00-01328-CV, 2002 WL 1340296, at *2 (Tex. App.—Houston [1st Dist.] June 20, 2002, no pet.) (not designated for publication).

Accordingly, Mother's notice of appeal also does exactly what it purports to do. It invokes our appellate jurisdiction over the trial court's January 29, 2024 conservatorship decree concerning Laura and Ophelia—and nothing more. *See Nnaka*, 2020 WL 425126, at *4. In apparent recognition of that fact, Mother now seeks to amend her notice of appeal to add the final decree from the severed termination case involving Andrew. And she wishes to challenge that final termination decree in three of her five issues on appeal.

Rule 25.1(g) permits an appellant to amend a notice of appeal to correct a defect or omission. *See* TEX. R. APP. P. 25.1(g). It allows for amendment of an earlier filed notice of appeal to correct mistakes or accidents, such as inadvertently omitting one of the statements required by Rule 25.1(d) or correcting a typographical error. *See Rainbow Grp., Ltd. v. Wagoner*, 219 S.W.3d 485, 492 (Tex. App.—Austin 2007, no pet.) (citations omitted).

However, Rule 25.1(g) does not permit the amendment of a notice of appeal to add an entirely different final judgment from which the appeal is taken. *Id.*; *Perez v. Perez*, No. 09-06-521 CV, 2007 WL 5187895, at *7 (Tex. App.—Beaumont May 22, 2008, pet. denied) (mem. op.). "Multiple Texas courts have held that a party may not amend its notice of appeal to challenge an entirely different order than the one named in the original notice of appeal." *See Nnaka*, 2020 WL 425126, at *5 (collecting cases).

20

Here, Mother is asking us to ignore the specific language in her notice of appeal that shows she sought to appeal only the final decree in the conservatorship case regarding Laura and Ophelia—and allow her to add a different final decree in another cause number to her existing notice of appeal. Jurisprudentially, we cannot do so. *See Rainbow Grp.*, 219 S.W.3d at 493 ("[W]e cannot ignore the specific language in Rainbow Group's initial notice of appeal indicating that it was appealing the November 23 order and instead allow it, by amendment, to appeal a completely separate order entered on December 19.").

Indeed, under these circumstances, there is no defect or omission in Mother's existing notice of appeal to be amended. *See Nnaka*, 2020 WL 425126, at *5. Stated differently, Mother may not amend her notice of appeal "to challenge an entirely different order than the one named in the original notice of appeal." *See id.*; *Rainbow Grp.*, 219 S.W.3d at 493.

Accordingly, we deny Mother's motion to amend her notice of appeal. Because Mother failed to invoke our appellate jurisdiction over the final decree in cause number 2023-00153J-A regarding Andrew, we lack jurisdiction to consider her three issues on appeal which challenge it.

We now turn to Mother's remaining two issues that challenge the conservatorship decree regarding Laura and Ophelia.

**Denial of Motion for Continuance**

In her first issue, Mother argues that the trial court abused its discretion by denying her motion for continuance and extension of the statutory dismissal date. We disagree.

In a suit filed by DFPS seeking termination of parental rights, the trial court generally loses jurisdiction over the case on "the first Monday after the first anniversary" of the date the court rendered a temporary order appointing DFPS as temporary managing conservator. TEX. FAM. CODE § 263.401(a); *In re J.R.*, 652 S.W.3d 508, 510 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). The case is automatically dismissed on that date unless the court has commenced trial or granted an extension. TEX. FAM. CODE § 263.401(a).

A trial court may extend the dismissal date, and retain the suit on its docket for up to an additional 180 days, if it "finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of [DFPS] and that continuing the appointment of [DFPS] as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

Texas law allows a parent to demand a jury trial in a proceeding to terminate their parental rights. *In re A.L.M.-F.*, 593 S.W.3d 271, 275 (Tex. 2019); TEX. FAM. CODE § 105.002(a)–(b). The Texas Constitution states that "[t]he right of trial by jury shall remain inviolate." TEX. CONST. art. I, § 15. But, in civil cases, a party can

procedurally forfeit the right to a jury trial by failing to make a timely jury demand. *In re Marriage of Comstock*, 639 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Texas Rule of Civil Procedure 216 states "[n]o jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance."[9] TEX. R. CIV. P. 216(a).

Rule 251 requires that a motion for continuance be supported by affidavit, consent of the parties, or operation of law. TEX. R. CIV. P. 251. We review a trial court's denial of a motion for continuance for a clear abuse of discretion. *In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We cannot substitute our judgment for that of the trial court; instead, we must only determine whether the trial court's action was so arbitrary as to exceed the bounds of reasonable discretion. *Id.* A trial court abuses its discretion if its decision is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Id.* at 375. If a motion for continuance does not comply with the requirements of Rule 251, it will be presumed that the trial court did not abuse its discretion in denying the motion. *Id.*

---

[9]    A jury fee is not required if the party requesting a jury is indigent. *See* TEX. R. CIV. P. 216(b), 217. Here, as the trial court found, it is undisputed that Mother was indigent.

Here, the statutory dismissal date was January 29, 2024. In October 2023, the trial court scheduled trial to begin on December 14, 2023. No jury demand was on file. Three days before trial, Mother's counsel filed an opposed motion for continuance and extension of the statutory dismissal date. Counsel stated that he discovered Mother had filed a pro se petition for writ of mandamus in this Court on December 6, 2023, and an amended petition on December 8. He represented that in these filings, Mother contended that "she informed counsel she demanded a Jury Trial, counsel failed to propound discovery on [DFPS], maintained communication, nor interview witnesses."

Counsel requested a continuance of the trial so he could file a jury demand under Rule 216. Counsel further requested extension of the statutory dismissal date "to allow adequate time to conduct discovery." Mother's motion was not verified or accompanied by an affidavit.

At trial, Mother's counsel informed the trial court "that the mother was advised that she has a right to a jury trial" and "[t]he entire process was explained to her from start to finish throughout the whole case." Counsel also stated that when the parties were before the trial court for a hearing in November, "the Court denied the mother's request for a fifth attorney in this case."[10] Counsel asserted that if the

---

[10] The record shows that Mother filed a motion to discharge her appointed attorney on November 10, 2023. Mother argued that her counsel had failed to conduct discovery, interview witnesses, or take any actions that could be considered

24

court granted the motion for continuance and extension of the dismissal date, he "will file a jury demand and [he'll] do it promptly."

DFPS argued that Mother had been advised about her right to a jury trial and had "ample opportunity" to file a demand herself—noting that despite being represented by appointed counsel, Mother had filed her own motions during the pendency of the case. DFPS characterized Mother's actions as "just another delay tactic on her part" and referenced Mother's request for new appointed counsel "just a few weeks ago."

DFPS further argued that it was prepared for trial and no extraordinary circumstances justified a continuance or extension. It also argued that both Mother and Father had refused to engage in the services required by their service plans, and a delay of trial would "delay permanency for these children," who "are in stable placements."

Laura and Ophelia's ad litem attorney did not oppose Mother's motion, but was "not in agreement" and stated, "I think her not filing [a jury demand] is very telling that this is a delay." The Child Advocates representative similarly stated that she would not oppose a continuance if the trial court granted one, but she believed

advocating on her behalf. She also argued that she was unable to communicate with her counsel, leading to a conflict of interest between them and her counsel's inability to effectively represent her. Mother requested that the trial court discharge her attorney and appoint new counsel for her. The trial court denied Mother's motion in a written order.

it was in the children's best interest to "receive permanency as soon as possible" and "go ahead with the trial today." And Andrew's attorney ad litem was not opposed because Andrew "has permanency" and is "in a good home," and delaying trial for a few weeks "is not going to be detrimental to him in any way."

The trial court denied Mother's motion for continuance and explained:

> [The] Court set this case for trial on October 3rd, 2023, well in advance of any deadlines of a jury demand request. The Court has looked through the file. The Court does not see a jury demand on file. There [are] no extraordinary circumstances to extend the dismissal date. The case is ripe for trial and the children need permanency today. The Court calls this case to trial.

When the trial court heard Mother's motion for continuance on the eve of trial, Mother still had not filed a jury demand as specified by Rule 216. Thus, the trial court could have reasonably determined that Mother procedurally forfeited her right to a jury trial. *See In re Marriage of Comstock*, 639 S.W.3d at 128; TEX. R. CIV. P. 216(a). Moreover, Mother did not support her motion for continuance with an affidavit as required by Rule 251. *See* TEX. R. CIV. P. 251.

Accordingly, based on the record before us, we conclude that the trial court did not clearly abuse its discretion in denying Mother's motion for continuance and to extend the statutory dismissal date.

We overrule Mother's first issue.

26

**Appointment of DFPS as Sole Managing Conservator**

In Mother's fifth issue, she contends that the trial court abused its discretion by naming DFPS as the sole managing conservator of Laura and Ophelia.

In determining issues of conservatorship and possession, the best interest of the child "shall always be the primary consideration of the court." TEX. FAM. CODE § 153.002; *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). The trial court is authorized to appoint a managing conservator, which must be "a parent, a competent adult, the Department of Family and Protective Services, or a licensed child-placing agency." TEX. FAM. CODE § 153.005(a)–(b); *In re J.A.J.*, 243 S.W.3d 611, 614 (Tex. 2007). If the trial court appoints a managing conservator, it may also appoint one or more possessory conservators. TEX. FAM. CODE § 153.006(a). The court shall specify the rights and duties of conservators. *Id.* §§ 153.006(b), 153.071.

The Family Code creates a rebuttable presumption that a parent will be appointed as a child's managing conservator. *See In re J.A.J.*, 243 S.W.3d at 614. Section 153.131(a) provides that "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development" or finds that a history of family violence exists involving the parents, a parent should be appointed sole managing conservator. TEX. FAM. CODE

§§ 153.131(a)–(b), 153.004 (requiring consideration of family violence, sexual abuse, or child neglect by parent); *In re J.A.J.*, 243 S.W.3d at 614.

The trial court may render a final order appointing DFPS as managing conservator without terminating the parent's rights to the child if the court finds that:

> (1)     appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; and
>
> (2)     it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator.

TEX. FAM. CODE § 263.404(a); *In re J.A.J.*, 243 S.W.3d at 614; *see also* TEX. FAM. CODE § 161.205 (providing that if court does not order termination of parental rights, court shall deny petition seeking termination and "render any order in the best interest of the child").

In determining whether to appoint DFPS as managing conservator without terminating the parent's rights, the court shall consider: (1) whether the child will turn eighteen in not less than three years; (2) whether the child is twelve or older and has expressed a strong desire against termination or has continuously expressed a strong desire against being adopted; and (3) the needs and desires of the child. TEX. FAM. CODE § 263.404(b); *In re J.A.J.*, 243 S.W.3d at 614.

If the trial court does not appoint a parent as a managing conservator, it shall appoint the parent as possessory conservator "unless it finds that the appointment is

not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." TEX. FAM. CODE § 153.191. The terms of an order that denies possession or imposes restrictions or limitations on a parent's right to possession of or access to a child "may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193; *In re J.J.R.S.*, 627 S.W.3d at 220 (stating that section 153.193 "places an outer limit" on permissible scope of restrictions of possessory conservator's rights, and "a severe restriction or limitation" can be permissible if it is in child's best interest).

Unlike a decision terminating a parent's rights, which must be proved by clear and convincing evidence, "a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *In re J.A.J.*, 243 S.W.3d at 616. Conservatorship decisions are subject to review for abuse of discretion, and we may reverse such determinations only if the decision is arbitrary and unreasonable. *Id.*; *see In re J.J.R.S.*, 627 S.W.3d at 218. A trial court does not abuse its discretion by restricting a parent's possession of a child when the record contains some evidence to support a finding that the restrictions are in the child's best interest. *In re K.A.M.S.*, 583 S.W.3d 335, 344 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

At trial, DFPS requested termination of Mother's rights to all three children—although it acknowledged that Laura and Ophelia's guardian ad litem did not recommend termination of Mother's rights. In the alternative, DFPS sought sole managing conservatorship over the girls.

As memorialized in the final conservatorship decree, the trial court found that DFPS met its burden to establish four statutory predicate grounds for terminating Mother's parental rights to Laura and Ophelia. However, the court did not find that termination of Mother's rights was in the girls' best interest. Instead, it appointed DFPS as sole managing conservator for Laura and Ophelia. The court refused to appoint Mother as a possessory conservator. Instead, it required Mother to complete her service plan and a psychological assessment and hold any visits with Laura and Ophelia "in a therapeutic setting following the commencement of therapy services."

The record is undisputed that Mother loves her children and that Laura and Ophelia love her. Laura informed her guardian ad litem that she wanted to return to Mother's care "[o]nly if her mother completes her services and gets better." Mother, however, had not done so during the pendency of the proceeding. Ophelia had not directly expressed to her guardian ad litem whether she also wanted to return to Mother's care, but Ophelia "does light up" when asked about her family. Ophelia "loves to talk about her family, and she does talk about how much she misses her

30

mom and wants to see her mom," and she "talks about her mom and great deal when [Ophelia and the guardian ad litem] talk about family."

However, the trial court also heard testimony that Mother had a history of not respecting boundaries when it came to the children. In April 2023, while Ophelia was in foster care, she was hospitalized. Mother checked Ophelia out of the hospital, and DFPS was not notified until four days later. The DFPS caseworker had "no idea" how Mother was able to check Ophelia out, and she "seriously doubt[ed]" that Mother had any kind of legal paperwork stating that she was legally allowed to do so. DFPS had to seek a writ of attachment to regain custody of Ophelia. Mother claimed that she removed Ophelia from the hospital because she "was being beaten up," but when DFPS followed up with the hospital about whether Ophelia had been injured, DFPS could not substantiate this claim.

In another instance in June 2023, Ophelia ran away from her foster placement late at night. A law enforcement officer contacted several individuals including Mother, who picked up Ophelia and did not inform the officer that Ophelia was currently in a foster placement. When the DFPS caseworker learned about the incident the following morning, she contacted Mother, who was "nonresponsive." It took DFPS four days to regain physical custody of Ophelia, which it did when Mother brought Ophelia to an in-person court appearance. Mother informed the caseworker that she had not responded to the caseworker's calls concerning the

return of Ophelia to her foster placement because "she was waiting to hear back from her attorney."

Mother and Father also provided a cell phone to Ophelia. Due to Ophelia's history of watching inappropriate material on the internet and drawing graphic pictures, she was not allowed access to a cell phone or unrestricted access to the internet. The parents were aware at the time "about the concerns about [Ophelia's] access to the internet."

Mother also obtained the contact information for the children's foster placements, although that information is supposed to remain confidential. During the pendency of the case, Mother had "sought out foster parents," "had items delivered to the foster home," and "reached out to [the foster parents] personally," instead of allowing contact to occur through the caseworker. Although Mother had not contacted Andrew's foster parents, she had learned where his daycare was located. This concerned Andrew's foster mother because the daycare facility was close to her house and Mother had "previously kind of taken one of the other children, so [the foster parents] want to make sure [Andrew is] safe."

The children's caseworker was concerned that Mother's actions could cause emotional harm to the children, testifying that Mother "has a way of trying to manipulate the children to fit her scenario, and on multiple occasions, [the children] do tend to believe her because she's their mother." Mother's sister expressed a

similar sentiment, stating that Mother "has a tendency to when she wants something to happen, it's going to happen under her terms and there is no other way," and Mother uses "a lot of bullying and manipulation . . . in order to get there." Andrew's foster mother, Mother's sister, and Mother's grandmother all expressed concern that Mother might not respect court orders concerning possession of and access to the children if the court did not terminate her parental rights. Mother's grandmother further testified that if Ophelia was placed in her care but Mother's parental rights were not terminated, she would want any interactions between Mother and Ophelia to be "very specific and very monitored."

Accordingly, the evidence before the trial court demonstrated that Mother had not ameliorated DFPS's concerns which caused the removal of the children from her, that Mother had repeatedly disregarded boundaries set to protect the children in their placements, and that each of the potential placements for the children expressed concern over Mother's lack of regard for such boundaries.

We conclude that this is sufficient evidence to support the trial court's decision not to name Mother as Laura and Ophelia's possessory conservator. Specifically, that appointment of Mother as Laura and Ophelia's possessory conservator would not be in their best interest "and [that] parental possession or access would endanger the physical or emotional welfare of the children." *See* Tex. Fam. Code § 153.191.

Accordingly, we therefore hold that the trial court did not abuse its discretion by not appointing Mother as Laura and Ophelia's possessory conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re K.A.M.S.*, 583 S.W.3d at 344.

We overrule Mother's fifth issue.

## Conclusion

For all of the reasons above, we dismiss Father's appeal from the final termination decree in cause number 2023-00153J-A for lack of jurisdiction.

We deny Mother's request to amend her notice of appeal to add the final termination decree in cause number 2023-00153J-A.

And we affirm the final conservatorship decree in cause number 2023-00153J regarding Laura and Ophelia, as to both Mother and Father.



Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Hightower and Rivas-Molloy.